**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| MONICA CASTRO, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action |
| | § | No. C-06-61 |
| THE UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

On this day came on to be considered the United States' motion to dismiss for lack of subject matter jurisdiction, as well as the United States' motion for summary judgment (D.E. 29, 30).[1]  For the reasons set forth below, the Court GRANTS the United States' motion to dismiss Plaintiffs' tort claims for lack of subject-matter jurisdiction, the Court finds that Plaintiffs' claims for relief under the Fourth and Fifth Amendments to the United States Constitution are MOOT and are therefore DISMISSED, and the Court finds that Plaintiffs' claim for injunctive relief pursuant to 8 U.S.C. § 1101, et. seq., is also MOOT and is hereby DISMISSED.

**I.   Jurisdiction**

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346(b)(1) (suit

_____

[1]The United States filed a single document (D.E. 29, 30 (the same document filed twice)), asking the Court to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1), and in the alternative, seeking summary judgment on certain of Plaintiffs' claims against the Defendant.

against the United States).

## II.  **Factual Background**

The following facts are not in dispute:  Plaintiff Monica Castro, a United States citizen, moved with her parents from Corpus Christi, Texas to the Lubbock, Texas area when she was approximately fifteen years old. (PX-E, Attachment to DX-A, Castro Decl., p. 1).  Around the time that Ms. Castro was fifteen years old, she met Omar Gallardo, an illegal alien and Mexican national who lived in the same area as Ms. Castro.  (DX-A, PX-A, Castro Dep., 12:2-20; Castro Decl., p. 1).  When Ms. Castro was sixteen, she and Mr. Gallardo moved in together in a trailer near the trailer rented by Ms. Castro's parents.  (Castro Dep., 13:10-24). Ms. Castro became pregnant, and on December 4, 2002, Ms. Castro gave birth to her and Mr. Gallardo's child, R.M.G.  (Castro Dep., 14:3-4; Castro Decl., p. 1).  R.M.G., a United States citizen, was born at the University Medical Center in Lubbock, Texas.  (DX-J, PX-V, Certificate of Birth).  Ms. Castro was seventeen at the time of R.M.G.'s birth.[2]

---

[2]Ms. Castro and Mr. Gallardo may have had a common-law marriage in Texas.  There is some dispute as to whether Ms. Castro and Mr. Gallardo had a legally established common-law marriage as of the time of R.M.G.'s birth.  In Plaintiffs' response to the United States' motion (D.E. 34), Plaintiffs maintain that Ms. Castro could not have agreed to a common-law marriage until her 18th birthday, which was on April 30, 2003, after R.M.G. was born.  (Id.). Regardless, there is no dispute that Mr. Gallardo is R.M.G.'s father, both Mr. Gallardo and Ms. Castro are in agreement that R.M.G. is Mr. Gallardo's biological child.  (Castro Decl., p. 3; PX-B, Sanchez Decl., p. 2; DX-H, PX-U, Gallardo Dep., 23:24, 25:3-

Ms. Castro and Mr. Gallardo had a history of arguing with one another. (Castro Dep., 27: 4-9; DX-H, PX-U, Gallardo Dep., 13:2-10). Ms. Castro now maintains that Mr. Gallardo abused Ms. Castro during the course of their relationship, although Ms. Castro did not inform her parents or law enforcement authorities of this abuse. (Castro Dep., 22:2-23:24, 27:10-12; Castro Decl., pp. 1-2; DX-B, Rodriguez Dep., 8:24-9:4; DX-C, PX-W, Cendy Castro Dep., 15:13-21, 16:12-19). Ms. Castro maintains that Mr. Gallardo was a good father to R.M.G., and that he never abused his daughter. (Castro Dep., 32:24-25, 39:18-40:17, 86:3-10, 99:13-15).

On November 28, 2003, Ms. Castro and Mr. Gallardo got into an argument. (Castro Decl., p. 2). Ms. Castro called her grandparents, who also lived in the Lubbock area, to come and pick her up at the trailer she shared with Mr. Gallardo and R.M.G. (Castro Dep., 28:9-12; Castro Decl., p. 2). Ms. Castro's grandparents arrived to pick her up on November 29, 2003. (Castro Dep., 29:10-21). Ms. Castro left the trailer with her grandparents, and R.M.G. remained with Mr. Gallardo. (Castro Dep., 30:11-22; Castro Decl., pp. 2-3). Immediately thereafter, Ms. Castro commenced efforts to recover R.M.G. from Mr. Gallardo. (Castro Dep., 30:20-25; Castro Decl., p. 3). Ms. Castro contacted the Lubbock County Sheriff's Department, Texas Child Protective Services, and the Lubbock Police Department regarding the situation

---

6; Certificate of Birth).

with R.M.G.  (Castro Dep., 30:20-25, 45:7-11; Castro Decl., p. 3;
PX-R, Sanchez Mem., p. 1).  The agencies told Ms. Castro that since
Ms. Castro and Mr. Gallardo were married (pursuant to a common-law
marriage), and because Mr. Gallardo was the child's father, that
Mr. Gallardo had as much right to R.M.G. as did Ms. Castro.[3]
(Castro Dep., 31:24-32:10; Rodriguez Dep., 11:25-12:12; Castro
Decl., p. 3).  Ms. Castro was told that her issues with Mr.
Gallardo constituted a civil dispute, and Ms. Castro would have to
hire a private attorney to seek a custody order.  (Castro Dep.,
31:24-32:10; Castro Decl., p. 3).  Child Protective Services did
tell Ms. Castro that she could come fill out an application to
start the process for obtaining assistance from Child Protective
Services.  (Castro Dep., 32:8-16).  Child Protective Services told
Ms. Castro that this process would take one to two days.  (Castro
Dep., 32:11).  Ms. Castro did not fill out the application, because
she said she did not want to wait the one to two days.  (Castro
Dep., 32:17-23).

On December 1, 2003, Ms. Castro, along with her aunt Sophia
Rodriguez, went to the Lubbock Border Patrol station to report Mr.
Gallardo as an illegal alien.  (Castro Dep., 35:9-23; Castro Decl.,
p. 3; Rodriguez Dep., 10:4-16; DX-D, Sanchez Decl., p. 1; PX-B,

---

[3]As noted above, Ms. Castro and Mr. Gallardo may have had a
common-law marriage in Texas.  This Court makes no determination as
to whether or not Ms. Castro and Mr. Gallardo were legally married
at the time of the events in question.

Sanchez Dep., 114:2-117:14; Sanchez Mem., p. 1). They spoke with Border Patrol Agent Manuel Sanchez. (Castro Dep., 35:9-23; Sanchez Decl., p. 1; Sanchez Mem., p. 1; Castro Decl., p. 3). Ms. Castro informed Agent Sanchez that R.M.G. was currently with Mr. Gallardo, and that Ms. Castro was seeking to recover R.M.G. from Mr. Gallardo.[4] (Castro Dep., 39:3-6; Rodriguez Dep., 10:20-11:1; Sanchez Decl., p. 1; Sanchez Mem., p. 1; DX-F, Kurupas Decl., pp. 1-2; Sanchez Dep., 114:4-9). At this initial meeting, Agent Sanchez informed Ms. Castro that she needed to get a court order for temporary custody of R.M.G. (Sanchez Dep., 115:24-116:6). Agent Sanchez asked Ms. Castro to be present when Border Patrol went to the trailer to apprehend Mr. Gallardo and certain of his illegal alien relatives. (Castro Dep., 41:1-23, 96:3-6; Castro Decl., p. 3; Rodriguez Dep., 11:6-12; Sanchez Decl., p. 3; Sanchez Mem., p. 2; Kurupas Decl., p. 2). Agent Sanchez informed Ms. Castro that if she were present, Border Patrol could question everyone regarding their citizenship and then leave R.M.G. with Ms. Castro, since she both Ms. Castro and R.M.G. are United States citizens. (Sanchez Decl., p. 3; Sanchez Mem., p. 2; Kurupas Decl., p. 2; Sanchez Dep., 130:13-25, 142:9-13, 151:16-24). However, Ms. Castro did not wish to be present at the time Border Patrol

---

[4]Of note, Mr. Sanchez also informed Ms. Castro that Amarillo law enforcement authorities wanted to question Mr. Gallardo as a possible witness in connection with a homicide. (Castro Dep., 35:23-36:10, 39:7-17).

apprehended Mr. Gallardo and his relatives, Ms. Castro maintained that she was scared of what Mr. Gallardo and his family would do to her, and she did not want to be present when Border Patrol arrived. (Castro Dep., 41:1-23; Sanchez Decl., p. 3; Sanchez Mem., p. 2). Accordingly, Ms. Castro was not present when Border Patrol arrived in the morning of December 3, 2003 at the trailer that Ms. Castro had shared with Mr. Gallardo.  (Castro Dep., 58:25-59:25; Castro Decl., p. 3; Sanchez Decl., p. 4).  Rather, Ms. Castro watched the events unfold from her relatives' trailer across the street. (Castro Dep., 58:25-59:25; Castro Decl., p. 4).

Border Patrol took Mr. Gallardo, three of his brothers and his cousin to the Lubbock Border Patrol station.  (Sanchez Decl., p. 4; Sanchez Mem., p. 3; Kurupas Decl., p. 1; Galladro Dep., 15:4-20). Mr. Gallardo had R.M.G. with him, so R.M.G. also went to the station.  (Kurupas Decl., p. 1; Sanchez Mem., p. 3; Gallardo Dep., 17:13-17).   Mr. Gallardo, R.M.G. and Mr. Gallardo's relatives remained in a holding cell at the station. (Sanchez Dep., 160:11-161:7; PX-C, Crump Dep., 64:6-7).

Shortly thereafter Ms. Castro also arrived at the station, and she requested that her daughter be returned to her rather than remaining with Mr. Gallardo.  (Castro Dep., 63:14-65:25; Castro Decl., pp. 4-5; PX-M, Kurupas Dep., 94:24-25, 96:3-11).  However, Mr. Gallardo informed Border Patrol that Ms. Castro had walked out on him and R.M.G., and he wanted R.M.G. to remain with him.

(Sanchez Decl., pp. 4-5; Sanchez Mem., p. 3; Kurupas Decl., p. 2). At the direction of Agent in Charge Greg Kurupas, Agent Sanchez contacted the Texas Department of Family and Protective Services in Lubbock ("DFPS"), to inquire as to R.M.G. (Sanchez Decl., p. 5; Sanchez Mem., p. 3; DX-E, Perkins-McCall Decl., p. 1; Kurupas Decl., p. 2; Kurupas Dep., 98:4-11). DFPS asked if R.M.G. appeared as if she had been abused. (Id.). Agent Sanchez responded in the negative, he said that R.M.G. appeared to be well taken care of and in good health. (Id.). DFPS informed Agent Sanchez that given the circumstances, if the child was not abused or in any danger, they would not get involved. (Id.).

Border Patrol processed Mr. Gallardo and his relatives and prepared to repatriate them back to Mexico. (Sanchez Dep., 159:23-160:7, 163:5-164:8, 181:15-162:8). The transport to Mexico from Lubbock left by 3:15 each day, so Border Patrol planned to send Mr. Gallardo and his relatives by that time. (Sanchez Dep., 86:11-21).

Around 1:30 in the afternoon, Ms. Castro and her relatives engaged an attorney, Lina Trevino, to obtain a temporary custody order of R.M.G. for Ms. Castro. (Castro Dep., 67:16-25, 69:10-17, 73:20-75:15; Castro Decl., p. 5). Ms. Trevino drafted the necessary paperwork and proceeded to the courthouse to obtain a Judge's signature on the order. (Castro Dep., 75:2-23; Castro Decl., p. 5; PX-H, Trevino Dep., 16:2-6; 18:14-20:9). However, Ms. Trevino never filed any documents with the state court, rather Ms.

Trevino intended to wait for a Judge's signature and then later file the papers. (Trevino Dep., 18:14-25). Ms. Trevino called Border Patrol Agent in Charge Greg Kurupas to inform him that she was working on obtaining a Judge's signature on a temporary custody order. (Kurupas Decl., pp. 2-3; Castro Dep., 75:17-76:3; Trevino Dep., 16:9-18:12, 20:10-21:8). Agent Kurupas told Ms. Trevino that the repatriation transport had to leave by 3:15 p.m. (Kurupas Decl., p. 2; Exh. 1 to Kurupas Decl., Repatriation Agreement; Trevino Dep., 20:10-21:8). By the time the repatriation transport left Lubbock, Ms. Trevino was not able to obtain a Judge's signature on the temporary custody order. (Castro Dep., 76:4-7; Castro Decl., p. 5; Trevino Dep., 21:9-22:2). Ms. Trevino did not file any papers regarding custody of R.M.G., and she did not further pursue a custody order for Ms. Castro. (Trevino Dep., 23:10-24:22).

The repatriation transport vehicle left Lubbock around 3:15 on December 3, 2003, with Omar Gallardo on board with his and Ms. Castro's daughter R.M.G. (Kurupas Decl., p. 3).

Shortly after Mr. Gallardo and R.M.G. went to Mexico, Ms. Castro returned to live with her parents in Corpus Christi. (Castro Dep., 77:12-16; Castro Decl., p. 5).

In September, 2006, Mr. Gallardo was detained in the Amarillo

area on charges of illegal re-entry (8 U.S.C. § 1326(a)(1)).[5] While Mr. Gallardo was in custody, Mr. Gallardo and Ms. Castro came to an agreement whereby R.M.G., who was living in Mexico with Mr. Gallardo's parents, would be returned to the custody of Ms. Castro. (Galladro Dep., 44:10-24; DX-J, Stipulation Agreement). R.M.G. was returned to Ms. Castro's custody on December 1, 2006.

## III. <u>Procedural Background</u>

Ms. Castro filed the instant case on February 10, 2006, on her own behalf and as next friend of her daughter R.M.G. (together, "Plaintiffs") (D.E. 1).   In Plaintiffs' Original Complaint, Plaintiffs sought monetary damages and injunctive relief pursuant to the Fourth, Fifth and Tenth Amendments to the United States Constitution, and Plaintiffs also brought claims against the United States for negligence, intentional infliction of emotional distress, and false imprisonment (pursuant to the Federal Tort Claims Act).   Pursuant to a motion to dismiss filed by the United States (D.E. 17), this Court dismissed Plaintiffs' constitutional claims for monetary relief, as such claims "are barred by the doctrine of sovereign immunity".   (D.E. 26, p. 2).   Plaintiffs

---

[5]Case No. 2:06-cr-00068, United States District Court for the Northern District of Texas, Amarillo Division, assigned to the Hon. Mary Lou Robinson.  Mr. Gallardo pled guilty to the offense and on December 19, 2006, Mr. Gallardo was sentenced to ninety days in the custody of the Federal Bureau of Prisons, with credit for time served since September 21, 2006. (D.E. 34, 35, 36, Case No. 2:06-cr-00068, United States District Court for the Northern District of Texas).

filed their First Amended Complaint ("Amended Complaint") on May 19, 2006 (D.E. 22). In their Amended Complaint, Plaintiffs assert claims for injunctive relief under the Fourth and Fifth Amendments to the United States Constitution, as well as claims for negligence, intentional infliction of emotional distress, false imprisonment, abuse of process, and assault (pursuant to the Federal Tort Claims Act). (Amended Complaint, ¶¶ 28-43, 54-77). Plaintiffs also assert a claim for injunctive and declaratory relief pursuant to 8 U.S.C. § 1101, et. seq.[6] (Id. at ¶¶ 44-49).

The United States filed its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), and in the alternative, motion for summary judgment, on November 14, 2006 (D.E. 29, 30). The United States argues that this Court does not have subject matter jurisdiction over Plaintiffs' tort claims against the Defendant, because they are barred by the discretionary function exception to the Federal Tort Claims Act. In the alternative, the United States also argues that Defendant is entitled to summary judgment on Plaintiffs' tort claims against the United States (for negligence, intentional infliction of emotional distress, false imprisonment, abuse of process and assault). The United States has offered evidence in support of its motion, including excerpts from the depositions of Plaintiff Monica Castro, Ms. Castro's mother

---

[6]Defendant's motion does not address Plaintiffs' claim for injunctive and declaratory relief pursuant to 8 U.S.C. § 1101, et. seq.

Cendy Castro, and Ms. Castro's Aunt Sophia Rodriguez, as well as Declarations from Border Patrol Agents Manuel Sanchez and Greg Kurupas.  (See D.E. 29, Attachments, DX-A to DX-K).[7]

Plaintiffs filed their response to the United States' motion on January 13, 2007 (D.E. 34).[8]  Plaintiffs argue that the discretionary function exception to the Federal Tort Claims Act does not apply in this case, and that there are factual issues that preclude summary judgment on Plaintiffs' tort claims against the United States.  Plaintiffs have submitted evidence in support of their response, including excerpts of the depositions of Plaintiff Monica Castro, Attorney Lina Trevino, and Border Patrol Agents Manuel Sanchez, Andrea Crump and Greg Kurupas.  (See D.E. 34, Attachments, PX-A to PX-Z).

## IV. **Discussion**

### A. **Standard for 12(b)(1) Motions to Dismiss**

"Motions filed under Rule 12(b)(1) of the Federal Rules of

---

[7]Defendant also filed a reply brief in support of its motion (D.E. 35).  Defendant did not file a motion seeking permission to file its reply brief, as is required by the Court's Scheduling Order in this case.  (D.E. 11, Scheduling Order, ¶ 4 ("No reply to the opposition to a motion will be filed by movant without leave of Court on good cause")).  However, in the interests of justice, the Court will treat Defendant's reply as if Defendant had filed the required motion for leave to file a reply brief, and the Court will consider Defendant's reply brief in determining whether to grant or deny Defendant's motion.

[8]The Court granted Plaintiffs' request for an extension of time to respond to the Defendant's motion (D.E. 32).  Plaintiffs' response was due on January 15, 2007.  (D.E. 33).

Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001); see also Fed. R. Civ. P. 12(b)(1).   A court may find lack of subject matter jurisdiction "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996) (internal citations omitted).   "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." Ramming, 281 F.3d at 161; see also McDaniel v. United States, 899 F.Supp. 305, 307 (E.D. Tex. 1995) ("On a 12(b)(1) motion, challenging the jurisdiction of the court, the burden lies with the party invoking the court's jurisdiction").

"A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss., 143 F.3d 1006, 1010 (5th Cir. 1998); see also Trans-Serve, Inc. v. United States, 2003 WL 23269560, *2 (W.D. La. 2003) ("Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle

plaintiff to relief."); <u>Russell v. Choicepoint Servs., Inc.</u>, 302
F.Supp.2d 654, 658 (E.D. La. 2004) (same).

### B.   <u>Plaintiffs' Tort Claims Are Barred by the Discretionary Function Exception to the Federal Tort Claims Act</u>

#### 1.   <u>Sovereign Immunity and the Federal Tort Claims Act</u>

"[T]he United States is a sovereign, and, as such, is immune
from suit unless it has expressly waived such immunity and
consented to be sued." <u>Hebert v. United States</u>, 438 F.3d 483, 487
(5th Cir. 2006); <u>Truman v. United States</u>, 26 F.3d 592, 594 (5th
Cir. 1994) ("As the sovereign, the United States is immune from
suit unless, and only to the extent that, it has consented to be
sued") (citing <u>FDIC v. Meyer</u>, 510 U.S. 471 (1994)).  Sovereign
immunity is jurisdictional in nature. <u>See</u> <u>Fed. Deposit Ins. Corp.
v. Meyer</u>, 510 U.S. 471, 475 (1994).  Such immunity protects the
United States from liability, and deprives the court of subject-
matter jurisdiction over claims against the United States.  <u>See
Hebert</u>, 438 F.3d at 487-88 (citing <u>United States v. Mitchell</u>, 463
U.S. 206, 212 (1983)).  Thus, before a court proceeds on a case
against the United States, it "must first decide whether one of the
government's several waivers of sovereign immunity applies."
<u>Truman</u>, 26 F.3d at 594.

The Federal Tort Claims Act provides consent for suit against
the United States "for injury or loss of property, or personal
injury or death caused by the negligent or wrongful act or omission

of any employee of the Government while acting within the scope of his office or employment."   28 U.S.C. § 1346(b)(1); <u>see also</u> <u>Johnston v. United States</u>, 85 F.3d 217, 218-19 (5th Cir. 1996); <u>Truman</u>, 26 F.3d at 594 ("Through the enactment of the FTCA, the government has generally waived its sovereign immunity from tort liability for the negligent or wrongful acts or omissions of its agents who act within the scope of their employment").[9]

### 2. Discretionary Function Exception to the Federal Tort Claims Act

The "discretionary function" exception to the Federal Tort

---

[9]Of note, there is an exception to the Federal Tort Claims Act, which provides that the Act does not apply to "any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights". 28 U.S.C. § 2680(h).   However, the Federal Tort Claims Act's waiver of immunity still applies to allow a plaintiff to proceed on claims arising out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution <u>if</u> the actions complained of are "acts or omissions of investigative or law enforcement officers of the United States Government". <u>Id.</u>; <u>see also</u> <u>Jeanmarie v. United States</u>, 242 F.3d 600, 603-04 (5th Cir. 2001); <u>Cross v. United States</u>, 159 Fed.Appx. 572, 576 (5th Cir. 2005).   This law enforcement proviso of 28 U.S.C. § 2080(h) applies to Plaintiffs' assault, abuse of process and false imprisonment claims against the Defendant.   This is because the actions Plaintiffs complain of were those taken by Border Patrol Agents, and Border Patrol Agents are federal law enforcement officers for purposes of the Federal Tort Claims Act.   <u>See</u> <u>Ysasi v. Rivkind</u>, 856 F.2d 1520, 1525 (Fed. Cir. 1988) (holding that Border Patrol Agents are federal law enforcement officers for the purposes of the law enforcement proviso of 28 U.S.C. § 2680(h)); <u>Sanchez v. Rowe</u>, 651 F.Supp. 571, 573 (N.D. Tex. 1986) (finding that a Border Patrol Agent is "a law enforcement officer within the meaning of the FTCA") <u>United States v. Brignoni-Ponce</u>, 422 U.S. 899, 906 (1975) ("The Border Patrol has approximately 1,700 agents, who are well-trained law enforcement officers").

Claims Act provides that the United States is not liable for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); see also United States v. Gaubert, 499 U.S. 315, 322 (1991). "The exception only covers acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice.'" Gaubert, 499 U.S. at 322 (citing Berkovitz v. United States, 486 U.S. 531, 536 (1988)). "It is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." United States v. Varig Airlines, 467 U.S. 797, 813 (1984); see also ALX El Dorado, Inc. v. Southwest Sav. & Loan Ass'n/FSLIC, 36 F.3d 409, 411-12 (5th Cir. 1994) ("In determining whether the discretionary function exception bars a suit against the government, the focus of the inquiry is on the nature of the action taken and on whether that action is subject to policy analysis.").

In Gaubert, The Supreme Court established a two-prong test in order to determine when the discretionary function exception applies to a plaintiff's claim.

> For the exception to apply, the first prong requires that the challenged governmental action be the product of judgment or choice. Under this prong, we determine whether a statute, regulation, or policy mandates a specific course of action. If such a mandate exists, the discretionary function exception does not apply and the claim may move

forward.  When no mandate exists, however, the governmental
action is considered discretionary and the first prong is
satisfied.  The second prong requires that the judgment or
choice be based on considerations of public policy.  Under
this prong, we determine whether the judgment is grounded
in social, economic, or political policy.  If the judgment
of the governmental official is based on any of these
policy considerations, then the discretionary function
exemption applies and the claim is barred.

Garza v. United States, 161 Fed.Appx. 341, 344 (5th Cir. 2005)

(internal citations omitted); see also Theriot v. United States,

245 F.3d 388, 397 (1998) (citing Gaubert, 499 U.S. at 322-24) (For

the discretionary function exception to apply, "[f]irst, the

conduct must be discretionary in nature, that is it must 'involv[e]

an element of judgment or choice.' ... Second, the judgment or

decision must be grounded on considerations of social, economic, or

political public policy.").  This second prong has also been

classified as encompassing conduct that the "discretionary function

exception was designed to shield." Tremblay v. United States, 261

F.Supp.2d 730, 734 (S.D. Tex. 2003) (citing Berkowitz, 486 U.S. at

536).

### 3.   The Border Patrol Agents' Actions Were The Product of Judgment or Choice

The first prong of the Gaubert test requires that the

challenged governmental action be the product of "judgment or

choice." Gaubert, 499 U.S. at 322.  This prong is not satisfied if

a statute, regulation, or policy mandates a specific course of

action.  See Garza, 161 Fed.Appx. at 344.  For the reasons set

forth below, the Border Patrol Agents' decision to let R.M.G. accompany her father back to Mexico was the product of a judgment or choice, and the Border Patrol Agents' conduct in the situation was not mandated by any statute, regulation or policy.

**a.   Actions of Ms. Castro Led to Difficult Choice for the Border Patrol Agents**

Ms. Castro left R.M.G. in the trailer with Mr. Gallardo on November 29, 2003, and immediately thereafter she contacted the Lubbock County Sheriff's Department, the Lubbock Police Department, and Texas Child Protective Services regarding her situation. (Castro Dep., 30:20-25, 45:7-11; Castro Decl., p. 3; Sanchez Mem., p. 1). All of these agencies told Ms. Castro that in order for her daughter to be returned to her from Mr. Gallardo, ***Ms. Castro would have to obtain an order granting her custody of R.M.G.*** (Castro Dep., 31:24-32:10; Rodriguez Dep., 11:25-12:12; Castro Decl., p. 3). However, even after receiving this information, Ms. Castro took no action regarding a custody order. (Id.). Rather, Ms. Castro waited two days, until December 1, 2003, and then she elected to go to the Border Patrol to report Mr. Gallardo as an illegal alien.[10] (Castro Dep. 35:9-23; Castro Decl., p. 3;

---

[10]The Court notes that Child Protective Services also told Ms. Castro that she could come fill out an application that would allow Child Protective Services to help her. (Castro Dep., 32:8-16). Ms. Castro was told that this process would take one to two days. (Castro Dep., 32:11). Ms. Castro decided not to go to Child Protective Services to fill out the application, because she did not want to wait the one to two days, she said "I wanted my

Rodriguez Dep., 10:4-16; Sanchez Decl., p. 1; Sanchez Dep., 114:2-117:14).  Ms. Castro spoke with Border Patrol Agent Sanchez, who also told Ms. Castro that she needed to obtain a temporary custody order of R.M.G.  (Sanchez Dep., 115:24-116:6).  Agent Sanchez also asked Ms. Castro to be present when Border Patrol arrived to arrest Mr. Gallardo and his relatives.  (Sanchez Decl., p. 3; Sanchez Mem., p. 2; Kurupas Decl., p. 2; Sanchez Dep., 130:13-25; 142:9-13; 151:16-24).  As noted above, the purpose of having Ms. Castro present was so Border Patrol could do a citizenship check at the time they apprehended Mr. Gallardo and his relatives, and Border Patrol could then leave R.M.G. with Ms. Castro because they were both United States citizens.  (Id.).  This would have prevented R.M.G. from going to the Border Patrol station with Mr. Gallardo.  (Id.).  However, Ms. Castro chose not to be present at the arrest of Mr. Gallardo and his relatives, rather Ms. Castro watched the events unfold from a nearby relatives' trailer home.  (Castro Dep., 41:1-23, 58:25-59:25; Castro Decl., p. 3; Sanchez Decl., pp. 3-4; Sanchez Mem., p. 2).  Since Ms. Castro was not present at the arrest, R.M.G. traveled to the Border Patrol station with her father.  (Kurupas Decl., p. 1; Sanchez Mem., p. 3; Gallardo Dep., 17:13-17).  Moreover, even though Mr. Gallardo and R.M.G. were taken to the Border Patrol station very early in the morning, Ms.

daughter already."  (Castro Dep., 32:17-23).  However, for an unknown reason, Ms. Castro waited two days regardless, and then she chose to go to the Border Patrol to report Mr. Gallardo.

Castro waited until approximately 1:30 p.m. to meet with attorney Lina Trevino to begin the process of obtaining a custody order. (Trevino Dep., 9:18-22).  Ms. Trevino never actually filed a state court suit regarding R.M.G., rather Ms. Trevino went to the courthouse to try to obtain a Judge's signature, with the intention of filing the required papers after the signature was obtained. (Trevino Dep., 18:14-25).  When Ms. Trevino was not able to obtain a Judge's signature on the temporary custody order before the repatriation transport left for Mexico, Ms. Trevino did not further pursue a custody order on Ms. Castro's behalf.  (Trevino Dep., 23:10-24:22).

The end result of all of these actions is that Ms. Castro had no custody order granting her even temporary custody of R.M.G., even though she had had several days to obtain such an order.  A court case regarding R.M.G. had not even been filed at the time R.M.G. accompanied her father into Mexico.  Given these circumstances, the Border Patrol Agents were faced with an untenable decision:  either forcibly remove R.M.G. from Mr. Gallardo even though there was no custody order directing them to do so, or let Mr. Gallardo continue with his possession of R.M.G., even though Mr. Gallardo was being repatriated to Mexico.

b.  **Border Patrol Agents' Actions Were Not Directed by Statute, Policy or Regulation**

As a result of the circumstances described above, the Border

Patrol was left without a "good" option with a wholly positive outcome. However, there was no statute, regulation or policy that directed the Border Patrol Agents to take a certain course of action in this unique situation.[11] (DX-F, Smietana Decl., ¶¶ 3-4).

In this case, there was no custody order in favor of Ms. Castro, no court case had been filed, R.M.G. was with her father Mr. Gallardo, and Mr. Gallardo was not willing to relinquish possession of his child. Given the circumstances, Border Patrol Agents made the decision not to forcibly remove the child from Mr. Gallardo, and they let R.M.G. go with Mr. Gallardo to Mexico. There was no statute, regulation or policy mandating that Border Patrol should have taken another course of action, *i.e.* removing R.M.G. from Mr. Gallardo and giving her to Ms. Castro, or removing R.M.G. from Mr. Gallardo and attempting to place her in protective custody. (Id.). The Court does not today condone the Border Patrol's actions or the choices it made on that day. However,

---

[11]The Court notes that Defendant has submitted evidence that:

> [T]here are no policies, rules or statutes governing the apprehension and detention of a foreign national in lawful custody of his or her U.S. juvenile child ... There are no mandatory federal statutes, regulations or policies prescribing the actions of a Border Patrol Agent when he or she encounters a foreign national with lawful custody of his or her minor, U.S. citizen child with respect to the minor child.

(Smietana Decl., ¶ 3). Plaintiffs agree with this statement in their Response to Defendant's motion. (Response, p. 9, stating that "[b]y Defendant's own admission" there are no policies, rules or statutes that apply in the above-described situation).

there is no statute, regulation or policy that would have mandated that the Border Patrol take another course of action on December 3, 2003.  (Id.).[12]

### c. __Border Patrol Did Not Make a "Custody Determination" as to R.M.G.__

Plaintiffs' main argument is that in letting R.M.G. go with her father to Mexico, the Border Patrol Agents made an "impermissible custody determination" in favor of Mr. Gallardo. (Response, p. 15).  Plaintiffs' argument is unpersuasive, because the same holds true for the reverse:  accepting Plaintiffs' argument as true, if the Border Patrol had forcibly removed R.M.G. from Mr. Gallardo so as to place her with her mother, the Border Patrol Agents would also be making an "impermissible custody determination" in favor of Ms. Castro.[13]   The Border Patrol Agents

---

[12]Further, the Court notes that contrary to Plaintiffs' argument in their response, R.M.G. was not technically "deported" by the Border Patrol.  (Response, pp. 9-10).  When R.M.G. went to Mexico with her father, she was legally free to return to the United States, unlike someone who has been legally deported from this country.  In fact, R.M.G. did return to the United States on December 1, 2006, to live with Ms. Castro.

[13]The Court notes that Plaintiffs state in their response that "Absent court orders to the contrary, parents have _equal_ rights regarding their children."  (Response, p. 16) (emphasis in original).  In this case, as of December 3, 2003, there was no court order granting either Mr. Gallardo or Ms. Castro custody of R.M.G.  Accordingly, both parents had equal rights to the child. Plaintiffs argue that Border Patrol made a custody determination for Mr. Gallardo by leaving R.M.G. with her father, but Plaintiffs do not state how the situation would be any different if Border Patrol had forcibly removed R.M.G. from Mr. Gallardo and placed her with Ms. Castro -- since, as Plaintiffs admit, Mr. Gallardo and Ms.

did not actually make any "custody determination" on December 3, 2003.  The Border Patrol issued no custody order and made no determination that R.M.G. should remain permanently with either her mother or her father.[14]  Rather, regardless of whether R.M.G. went with Mr. Gallardo to Mexico or whether she remained with Ms. Castro in Texas, the other parent still had legal parental rights ***and was free to seek a court custody order at a later date***.  In fact, that is exactly what Ms. Castro did, and R.M.G. returned to live with Ms. Castro on December 1, 2006.  (Response, p. 7).

### d.  Border Patrol's Decision Satisfies the First Prong of the *Gaubert* Test

Based on the above, the Border Patrol Agents' decision to allow R.M.G. to remain with her father when he was repatriated to Mexico satisfies the first prong of the Gaubert test.  See Gaubert, 499 U.S. at 322.  The Border Patrol had given Ms. Castro an opportunity to be present at the time of the arrest, and Agent Sanchez told Ms. Castro that if she were present, R.M.G. would have

---

Castro had "equal rights" to R.M.G.  (Response, p. 14).

[14]The Court notes that if Texas is a child's "home state," it is the Texas state courts that have jurisdiction to make an initial child custody determination.  Tex. Fam. Code § 152.201; see also Powell v. Stover, 165 S.W.3d 322, 325 (Tex. 2005); In re S.R.T., 2006 WL 397946, *1 (Tex. App--San Antonio 2006).  A child's "home state" is defined as "the state in which a child lived with a parent or person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." Tex. Fam. Code § 152.102(7).  Texas was R.M.G.'s home state as of the date of the events in question in this case. (Castro Dep., 20:2-21; Cendy Castro Dep., 16:23-17:1).

remained with Ms. Castro rather than being transported to the
Border Patrol station.  It was Ms. Castro's decision not to be
present at the time of the arrest, and it was Ms. Castro's decision
not to seek a custody order of her daughter prior to an hour and a
half before Mr. Gallardo was scheduled to be repatriated to Mexico.
Without a custody order and with R.M.G. in her father's possession
at the Border Patrol Station, the Border Patrol Agents were left to
make a difficult decision, one that was a product of a judgment or
choice, and one that was not regulated by any statute, policy or
regulation mandating a specific course of action.

### 4.   The Border Patrol's Actions Also Satisfy the Second Prong of the *Gaubert* Test

The second prong of the <u>Gaubert</u> test asks whether the
challenged "judgment or decision must be grounded on considerations
of social, economic, or political public policy."  <u>Theriot</u>, 245
F.3d at 397 (internal citations omitted).  "[T]he pertinent inquiry
on the 'policy analysis' prong of the [<u>Gaubert</u>] discretionary
function exception inquiry is not whether the discretionary act at
issue involved actual policy analysis but whether the act was
***susceptible to policy analysis***.'" <u>Bragg v. United States</u>, 55
F.Supp.2d 575, 584 (S.D. Miss. 1999) (internal citations omitted)
(emphasis added); <u>Baldassaro v. United States</u>, 64 F.3d 206, 211
(5th Cir. 1995) (internal citations omitted) ("the appropriate
inquiry is whether the act in question is susceptible to policy

analysis."); Andrade v. Chojnacki, 338 F.3d 448, 457 (5th Cir. 2003) (internal citations omitted) ("the applicability of the discretionary function exception does not turn on evidence of the actual decisions made by the defendants, but, rather, on whether the decision is or is not susceptible to policy analysis"); Lakomy v. United States, 70 Fed.Appx. 199, 204 (5th Cir. 2003) (internal citations omitted) ("Second, we examine whether the judgment or decision is grounded on considerations of social, economic, or political public policy. The exception applies to any judgment or choice that is susceptible to policy analysis.").

In this case, the Border Patrol Agents' decision to allow R.M.G. to accompany Mr. Gallardo to Mexico is a decision that is "susceptible to policy analysis." Id. As noted above, on December 3, 2003, there was no custody order granting either Ms. Castro or Mr. Gallardo custody of R.M.G, and the Border Patrol Agents were not mandated to act in a certain way pursuant to a statute, regulation or policy. (Smietana Decl., ¶¶ 3-4). Rather, the Border Patrol Agents had to make a policy decision as to what to do with R.M.G. The options included (1) forcibly removing R.M.G. from Mr. Gallardo and placing her with Ms. Castro; (2) expending further resources in detaining Mr. Gallardo in Lubbock while Ms. Castro belatedly sought a court custody order; or (3) allowing R.M.G. to accompany her father to Mexico. The Border Patrol Agents chose the third option. The Court today does not hold that this was the

optimal course of action.  However, the Border Patrol Agents' decision was unequivocally subject to policy analysis, as it involved the use of government resources and necessarily involved a decision as to what the Border Patrol should do with a United States citizen child in the unique circumstances presented by such a case.  See, e.g., Cazales v. Lecon, Inc., 994 F.Supp. 765, 767 (S.D. Tex. 1997) ("Policy analysis may include the weighing of competing interests or the examination of economic constraints in light of the needs of the public."); Baum v. United States, 986 F.2d 716, 724 (4th Cir. 1993) (a decision as to the best allocation or use of resources is "inherently bound up in considerations of economic and political policy, and accordingly is precisely the type of governmental decision that Congress intended to insulate from judicial second-guessing").  Accordingly, the Court finds that the Border Patrol Agents' decision does meet the second prong of the Gaubert test.  See Baldassaro, 64 F.3d at 211.

For the reasons set forth above, the Court determines that the Border Patrol Agents' actions satisfy both prongs of the Gaubert test, and the discretionary function exception applies to bar Plaintiffs' tort claims against the United States.  See Gaubert, 499 U.S. at 322.  Accordingly, Defendant's motion to dismiss is hereby GRANTED, and Plaintiffs' tort claims against the United States are DISMISSED for lack of subject-matter jurisdiction.

C.  **Plaintiffs' Constitutional Claims are Moot**

In their Amended Complaint, Plaintiffs assert claims for violation of the Fourth and Fifth Amendments to the United States Constitution.  (Amended Complaint, ¶¶ 28-43, First, Second and Third Causes of Action).  This Court has already ruled that Plaintiffs cannot seek monetary damages for their constitutional claims, as such claims for monetary relief "are barred by the doctrine of sovereign immunity." (D.E. 26, p. 2).  Accordingly, for all of Plaintiffs' constitutional claims in their Amended Complaint, Plaintiffs only seek injunctive relief.  (Id.; Amended Complaint, ¶¶ 28-43).  Specifically, Plaintiffs seek injunctive relief "*in the form of assistance from Defendant United States in locating and returning R.M.G. to the physical custody of Plaintiff Castro.*" (Id. at ¶¶ 33, 38, 43) (emphasis added).

As noted above, Ms. Castro's daughter R.M.G. was returned to Ms. Castro's custody on December 1, 2006.  (Response, p. 7).  Accordingly, Plaintiffs' constitutional claims seeking injunctive relief in the form of assistance in locating and returning R.M.G. to Ms. Castro are now MOOT.  The Court therefore DISMISSES Plaintiffs' first, second and third causes of action in their Amended Complaint, for violations of the Fourth and Fifth Amendments to the United States Constitution, as MOOT.

D.   **Plaintiffs' Claim for Injunctive Relief for Violation of 8 U.S.C. § 1101, *et. seq.*, is Moot**

In their Amended Complaint, Plaintiffs also allege a claim against the United States for a statutory violation of 8 U.S.C. § 1101, et. seq. (Immigration and Nationality Act).  Plaintiffs claim that the United States acted in violation of the statute "by detaining and removing a U.S. citizen."  (Amended Complaint, ¶ 47, Fourth Cause of Action).

Plaintiffs seek both declaratory and injunctive relief in redress for this claim.  Specifically, Plaintiffs seek declaratory relief "in the form of determination of the validity of any statute, regulation, policy or other procedure relied on to detain and deport Plaintiff R.M.G."  (Amended Complaint, ¶ 49).  Plaintiffs also seek injunctive relief, "in the form of assistance from Defendant United States in locating and returning R.M.G. to the physical custody of Plaintiff Castro".  (Id.).  As R.M.G. was returned to Ms. Castro's physical custody as of December 1, 2006, Plaintiffs' request for injunctive relief is hereby MOOT and is DISMISSED.[15]  However, since the Defendant did not raise Plaintiffs'

---

[15]As noted above, Defendant does not reference Plaintiffs' claim under 8 U.S.C. § 1101 in their motion.  However, the Court may still sua sponte dismiss Plaintiffs' claim for injunctive relief under the statute as moot.  See Berry v. Pierce, 98 F.R.D. 237 (E.D. Tex. 1983) ("since mootness is a question concerning the fundamental powers of a federal court under Article III, had the Court considered the case moot ... it would have been obliged to dismiss the case sua sponte.").

claim for declaratory relief in their motion to dismiss/motion for summary judgment, that claim currently remains pending.

**V.   Conclusion**

For the reasons set forth above, the Court hereby GRANTS Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), and Plaintiffs' claims for negligence, intentional infliction of emotional distress, false imprisonment, abuse of process and assault (under the Federal Tort Claims Act) are all hereby DISMISSED for lack of subject-matter jurisdiction. The Court finds that Plaintiffs' constitutional claims for violations of the Fourth and Fifth Amendments to the United States Constitution, as well as Plaintiffs' claim for injunctive relief under 8 U.S.C. § 1101, et. seq., are MOOT, and those claims are therefore DISMISSED. As it was not addressed in Defendants' motion, Plaintiffs' claim for declaratory relief under 8 U.S.C. § 1101, et. seq. currently remains pending.

SIGNED and ENTERED on this 9th day of February, 2007.

_____
Janis Graham Jack
United States District Judge